IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SULLO & BOBBITT, PLLC, et al.,       §
                                     §
                    Plaintiffs,      §
                                     §   Civil Action No. 3:11-CV-1926-D
VS.                                  §
                                     §
GREG ABBOTT, ATTORNEY                §
GENERAL OF TEXAS, et al.,            §
                                     §
                    Defendants.      §

MEMORANDUM OPINION
AND ORDER

A lawyer and law firm challenge the constitutionality of Tex. Gov't Code Ann.

§ 82.0651 (West 2011) (the "Civil Barratry Statute") and the denial by certain municipalities

and a justice court of immediate access to misdemeanor offense information that plaintiffs

seek to use in soliciting clients by direct mail.  Defendants move to dismiss plaintiffs' claims

under Fed. R. Civ. P. 12(b)(1) and/or 12(b)(6).  The court dismisses plaintiffs' claims for the

reasons that follow, but it also grants plaintiffs leave to replead.

I

This is an action by plaintiffs Sullo & Bobbitt, PLLC ("Sullo & Bobbitt") and Barry

L. Bobbitt ("Bobbitt") under 42 U.S.C. § 1983 against defendants Greg Abbott ("the

Attorney General"), in his official capacity as Attorney General of Texas, Stewart Milner

("Judge Milner"), in his official capacity as Chief Municipal Judge of the City of Arlington,

Texas, Gloria Lopéz-Carter ("Lopéz"), in her official capacity as Director of the City of

Dallas Municipal Court, Thomas G. Jones ("Justice Jones"), in his official capacity as Justice

of the Peace, Precinct 1-1 of Dallas County, Texas, and Ninfa L. Mares ("Judge Mares"), in her official capacity as Chief Municipal Judge of the City of Fort Worth, Texas.[1]

Bobbitt is a Texas attorney and an owner of Sullo & Bobbitt, a law firm.[2]  Bobbitt's practice focuses on defending individuals charged with misdemeanor offenses in the Dallas-Fort Worth area.  Plaintiffs advertise their availability for legal representation through direct mail solicitations.  To do so, plaintiffs request from courts, including those of Judge Milner, Justice Jones, and Judge Mares (collectively, "the Judges"), and from Lopéz, new misdemeanor citations, charges, and court filings for the purpose of identifying the defendant's name and address, the date of the violation or citation, and the criminal violation charged.  Plaintiffs send direct-mail solicitations within 30 days of the recipient's arrest or the issuance of a summons.

Plaintiffs bring two claims in this case.  First, they sue under § 1983 seeking a declaratory judgment against the Attorney General that Senate Bill 1716, which was codified as Tex. Gov't Code Ann. § 82.0651,[3] is an unconstitutional restraint on their First and

---

[1]Plaintiffs originally sued two prosecutors and three chiefs of police in their official capacities.  The two prosecutors have been dismissed with prejudice by notice of dismissal.  And plaintiffs expressly omitted the chiefs of police in their amended complaint.

[2]In deciding the Rule 12(b)(6) motions to dismiss, the court construes plaintiffs' amended complaint in the light most favorable to them, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in their favor.  *See, e.g., Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004).

[3]Although the Attorney General initially contends that plaintiffs' claim also disputes the constitutionality of Tex. Penal Code Ann. § 38.12(d)(2)(C) (West 2009), he recognizes in his reply that plaintiffs' claim is limited to the Civil Barratry Statute.

Fourteenth Amendment rights to commercial free speech.[4]  Second, they seek under § 1983 a declaratory judgment against the Judges and Lopéz, alleging that defendants' denial of immediate and contemporaneous access to new criminal citations, charges, and court filings violates plaintiffs' First and Fourteenth Amendment rights to access and unconstitutionally restrains their First and Fourteenth Amendment rights to commercial free speech.  Plaintiffs also allege under their second claim that they are "entitled" to ancillary injunctive relief but do not specifically pray for such relief.  *See* Am. Compl. ¶¶ 44 & 45(b).

The Attorney General[5] and Lopéz move to dismiss under Rules 12(b)(1) and 12(b)(6). The Judges move to dismiss under Rule 12(b)(6).  Plaintiffs oppose the motions.

## II

The court turns first to plaintiffs' claim against the Attorney General under § 1983 alleging that the Civil Barratry Statute is an unconstitutional restraint on their First and Fourteenth Amendment rights to commercial free speech.

---

[4]References in this memorandum opinion and order to Fourteenth Amendment rights are to First Amendment rights made applicable via the Fourteenth Amendment.

[5]The Attorney General adopts the arguments and authorities set forth in his first motion to dismiss.

A

The Civil Barratry Statute states, in relevant part:

> (c) A person who was solicited by conduct violating the laws of this state or the Texas Disciplinary Rules of Professional Conduct of the State Bar of Texas regarding barratry by attorneys or other persons, but who did not enter into a contract as a result of that conduct, may file a civil action against any person who committed barratry.

(d) A person who prevails in an action under Subsection (c) shall recover from each person who engaged in barratry:

> (1) a penalty in the amount of $10,000;
> (2) actual damages caused by the prohibited conduct; and
> (3) reasonable and necessary attorney's fees.

> (e) This section shall be liberally construed and applied to promote its underlying purposes, which are to protect those in need of legal services against unethical, unlawful solicitation and to provide efficient and economical procedures to secure that protection.

Tex. Gov't Code Ann. § 82.0651(c)-(e).[6]  According to plaintiffs, the Civil Barratry Statute

provides private enforcement for Tex. Penal Code Ann. § 38.12(d)(2)(C) (West 2009) (the

"Criminal Barratry Statute").  The Criminal Barratry Statute states, in relevant part:

> (d) A person commits an offense if the person:
> (1) is an attorney, chiropractor, physician, surgeon, or private investigator licensed to practice in this state or any person licensed, certified, or registered by a health care regulatory agency of this state; and
> (2) with the intent to obtain professional employment for the person or for another, provides or knowingly permits to be provided to an individual who has not sought the person's employment, legal representation, advice, or care a written

---

[6]Although § 82.0651 provides two separate civil remedies, plaintiffs appear to contest only the second, which is stated above. *See* Am. Compl. ¶¶12-13 (alleging that plaintiffs have accumulated potential liability of $1 billion for their direct-mail solicitations).

communication or a solicitation, including a solicitation in
person or by telephone, that:
(C) concerns an arrest of or issuance of a summons to the person
to whom the communication or solicitation is provided or a
relative of that person and that was provided before the 31st day
after the date on which the arrest or issuance of the summons
occurred[.]

Tex. Penal Code Ann. § 38.12(d)(2)(C).

In *Moore v. Morales*, 843 F. Supp. 1124 (S.D. Tex. 1994) (*"Moore I"*), *rev'd on other*

*grounds*, 63 F.3d 358 (5th Cir. 1995), the court held that the Criminal Barratry Statute was

unconstitutional and enjoined the defendants, including the Attorney General, from enforcing

the statute. *Id.* at 1133.  The Attorney General also issued an opinion that concluded:

[a]fter considering both the unappealed federal district court
decision in *Moore* [*I*], and particularly the appellate court's
opinion in *Ficker* [*v. Curran*, 119 F.3d 1150 (4th Cir. 1997)], we
believe section 38.12(d)(2)(C) of the Penal Code prohibiting an
attorney from sending a direct mail solicitation to a targeted
criminal defendant or his relatives within thirty days of his
arrest, neither directly or materially advances a substantial state
interest nor is narrowly drawn as provided under *Central
Hudson* [*Gas & Electric Corp. v. Public Service Commission of
New York*, 447 U.S. 557 (1980)], and thus contravenes the First
Amendment to the United States Constitution.

Tex. Att'y Gen. Op. No. JC-0022, 1999 WL 156298, at *4 (1999).  Plaintiffs contend that

although *Moore I* held the Criminal Barratry Statute unconstitutional and the Attorney

General considers it to be unconstitutional, the Texas Legislature has now authorized private

enforcement of the unconstitutional Criminal Barratry Statute by adopting the Civil Barratry

Statute, and that the Civil Barratry Statute is also unconstitutional.[7]

### B

The Attorney General moves to dismiss under Rule 12(b)(1), contending that the court lacks subject matter jurisdiction because plaintiffs do not have Article III standing.[8] "Federal courts cannot consider the merits of a case unless it presents an actual controversy, as required by Art. III of the Constitution and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008) (quoting *Steffel v. Thompson*, 415 U.S. 452, 458 (1974)) (internal quotations marks omitted); *see also, e.g., Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 541 (5th Cir. 2008). Standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The Attorney General's argument is limited to Article III standing. To satisfy the case-or-controversy

---

[7]The Attorney General is still enjoined from enforcing the Criminal Barratry Statute. *See Moore v. Morales*, 63 F.3d 358, 360 & 363 (5th Cir. 1995); *see also McKinley v. Abbott*, 643 F.3d 403, 406-07 & n.14 (5th Cir. 2011) (dismissing plaintiff's claim challenging Criminal Barratry Statute as moot because the Attorney General "ha[d] declared that neither he nor any county or district attorney in Harris and its bordering counties will attempt to enforce § 38.12(d)(2)(C) as it applies to written communications since it was declared unconstitutional" in *Moore I*).

[8]The Attorney General also contends that the court lacks subject matter jurisdiction because the declaratory judgment action is barred by the Eleventh Amendment and plaintiffs' claim is not ripe. Because the court holds that plaintiffs' action against the Attorney General must be dismissed for lack of standing, it need not address these other grounds for dismissal. These grounds can be reurged, if necessary, if plaintiffs include the Attorney General as a defendant in the amended complaint that this memorandum opinion and order permits them to file.

requirement of Article III, plaintiffs must allege facts demonstrating that they have "suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *see also Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 134 (5th Cir. 2009) (holding, in context of motion to dismiss, that plaintiff must allege facts that give rise to plausible claim of standing). The injury in fact must be "concrete and . . . actual or imminent, not conjectural or hypothetical," and "the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 & 561 n.1 (citations and internal quotation marks omitted). "A plaintiff can meet the standing requirements when suit is brought under the Declaratory Judgment Act by establishing actual present harm or a significant possibility of future harm, even though the injury-in-fact has not yet been completed." *Bauer v. Texas*, 341 F.3d 352, 357-58 (5th Cir. 2003) (citations and internal quotation marks omitted). The injury must also be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560-61 (alterations omitted) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). And "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressable by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38).

As the parties seeking to invoke federal jurisdiction, plaintiffs bear the burden of proving their standing. *Lujan*, 504 U.S. at 561. Because the Attorney General's motion to

dismiss is not supported by evidence, the court must decide the jurisdictional question based on the amended complaint alone, and must presume that the allegations of the amended complaint are true. *See, e.g., Garcia v. Boyar & Miller, P.C.*, 2007 WL 2428572, at *2 (N.D. Tex. Aug. 28, 2007) (Fitzwater, J.) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. May 1981)).  The court cannot dismiss the amended complaint if the allegations are sufficient to allege jurisdiction. *See id.* (citing *Paterson*, 644 F.2d at 523).  General factual allegations of injury resulting from defendant's conduct suffice to establish standing at the pleading stage because the court presumes that the allegations embrace facts supporting those allegations. *See, e.g., Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 2008 WL 5191935, at *3 (N.D. Tex. Dec. 11, 2008) (Fitzwater, C.J.) (quoting *Bennett*, 520 U.S. at 168).

## C

The Attorney General asserts that plaintiffs cannot demonstrate an actual and imminent injury because it is remote and conjectural to assume that a recipient of plaintiffs' direct-mail solicitation will file a civil lawsuit under the Civil Barratry Statute for a violation of the Criminal Barratry Statute, and it is not clear whether the recipient would prevail in the action because the recipient would also have to prove that civil liability will promote the Civil Barratry Statute's "underlying purposes, which are to protect those in need of legal services against unethical, unlawful solicitation and to provide efficient and economical

procedures to secure that protection," *see* § 82.0651(e).[9]  The Attorney General also contends that because he lacks the authority to enforce the Civil Barratry Statute, plaintiffs are unable to establish that their injury is redressable.

Plaintiffs assert that their injury is sufficient for Article III standing.  They allege that they are potentially civilly liable for up to $1 billion because, since the enactment of the Civil Barratry Statute, they have sent over 100,000 direct-mail solicitations to misdemeanor defendants within 30 days of the recipient's arrest or the issuance of a summons.  Plaintiffs maintain that the Civil Barratry Statute is a plausible threat to their right to free speech, "creating a dilemma for Plaintiffs to cease the mailings (and lose their free speech right) or continue the mailings (with the threat of being found liable for the ever increasing total civil penalty)."  Ps. Dec. 1, 2011 Br. 16.  Plaintiffs also emphasize that they are requesting a declaratory judgment that would end the serious threat and uncertainty over the treatment of the Civil Barratry Statute and obviate the risk that plaintiffs could be subject to multiple suits in multiple state courts.

---

[9]Although the Attorney General argues that the possibility of a civil lawsuit is remote and conjectural given that the Criminal Barratry Statute has a long-standing history of nonenforcement, an action under the Civil Barratry Statute does not on its face require a conviction under the Criminal Barratry Statute but merely a showing that the defendant "violat[ed] the laws of this state or the Texas Disciplinary Rules of Professional Conduct of the State Bar of Texas regarding barratry by attorneys or other persons."  Section 82.0651(c).

D

The court will assume *arguendo* that plaintiffs have pleaded an injury-in-fact.[10] Nevertheless, it raises *sua sponte* that the Attorney General is entitled to dismissal on the ground that plaintiffs lack standing because their injury is neither fairly traceable to the Attorney General nor is it likely redressed by a declaratory judgment against the Attorney General.[11]

1

"[F]ederal courts have consistently found a case or controversy in suits between state officials charged with enforcing a law and private parties potentially subject to enforcement." *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 905 (10th Cir. 2012) (citing *Doe v.*

---

[10]Because plaintiffs allege that they have taken and will continue to take actions that violate the Criminal Barratry Statute and can result in civil liability under the Civil Barratry Statute, it appears that the element of injury-in-fact is satisfied. *See McKinley*, 643 F.3d at 407 (holding that because plaintiff alleged that he had acted and intended to act in manner that could violate statute, plaintiff had established concrete injury that was actual and imminent); *cf. K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010) (holding that although plaintiffs' liability for suits had not yet materialized, "future events which are sufficiently likely to occur [may] serve as a basis for standing when the plaintiffs . . . are seeking injunctive relief"); *Roark & Hardee*, 522 F.3d at 542-43 ("The injury-in-fact element requires that a plaintiff show that he or she 'has sustained or *is immediately in danger of sustaining* some direct injury[.]") (emphasis in original) (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983)).

[11]Although the Attorney General did not seek dismissal on this basis, the court can consider the sufficiency of a complaint and "dismiss an action on its own motion 'as long as the procedure employed is fair.'" *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1177 (5th Cir. 2006) (quoting *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998) (per curiam)); *see also Coates v. Heartland Wireless Commc'ns, Inc.*, 55 F.Supp.2d 628, 633 (N.D. Tex. 1999) (Fitzwater, J.). Because the court is allowing plaintiffs to replead and address this deficiency if they can, the procedure employed here is fair.

*Bolton*, 410 U.S. 179, 188 (1973)); *see also, e.g., Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007) ("It is well-established that when a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision.").  But as plaintiffs recognize, the Civil Barratry Statute grants a remedy to a *private civil litigant* who was solicited by an attorney or others, in violation of state laws such as the Criminal Barratry Statute.  The Attorney General is powerless to enforce the Civil Barratry Statute against the plaintiffs and cannot cause them injury through the statute.  *See Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc) (holding that because statute accorded private civil litigant a cause of action, plaintiffs could not demonstrate how "any act of the defendants has caused, will cause, or could possibly cause any injury to them"); *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1248 (11th Cir. 1998) ("In a suit such as this one, where the plaintiff seeks a declaration of the unconstitutionality of a state statute and an injunction against its enforcement, a state officer, in order to be an appropriate defendant, must, at a minimum, have some connection with enforcement of the provision at issue."); *Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979) (stating that "[i]n a suit brought to have a declaration of the unconstitutionality of a state statute . . . an officer of a state is an appropriate defendant if he has some connection with the enforcement of the act").  "The requirements of *Lujan* are entirely consistent with the long-standing rule that a plaintiff may not sue a state official who is without any power to enforce the complained-of statute."  *Okpalobi*, 244 F.3d at 426.  This is because the injury must be "fairly traceable to the

challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560-61 (alterations omitted) (quoting *Simon*, 426 U.S. at 41-42).

2

Plaintiffs have also failed to satisfy the element of likelihood of redressability. They maintain that declaratory relief would redress their injury by halting the serious threat and uncertainty over the treatment of the Civil Barratry Statute in state court. But the threat that plaintiffs face is that private civil litigants will sue under the Civil Barratry Statute, not that the Attorney General will enforce the statute. A favorable decision against the Attorney General is not likely to redress this injury, given that he can neither prevent private litigants from filing and prosecuting claims under the Civil Barratry Statute nor prevent courts from adjudicating these private civil cases. *See Okpalobi*, 244 F.3d at 426 (noting long-standing rule that plaintiff may not sue state official who is without any power to enforce complained-of statute). And to the extent plaintiffs intend that declaratory relief against the Attorney General will alter the conduct of the private civil litigants suing under the Civil Barratry Statute, "[t]he real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff*" and not of a third party. *Hewitt v. Helms*, 482 U.S. 755, 761 (1987) (emphasis in original).

Accordingly, the court holds that plaintiffs lack Article III standing to bring their declaratory judgment claim against the Attorney General, and the action against the Attorney

General is dismissed.

III

Plaintiffs' second claim alleges that the denial by the Judges and Lopéz of immediate and contemporaneous access to new criminal citations, charges, and court case filings[12] violates plaintiffs' First and Fourteenth Amendment rights of access and indirectly restrains their First and Fourteenth Amendment rights to commercial free speech. Plaintiffs seek declaratory relief and, if necessary, ancillary injunctive relief.

To send direct-mail solicitations to misdemeanor defendants, plaintiffs request from the courts served by the Judges and Lopéz the "new misdemeanor citations[, charges,] and court case filings information sufficient to identify the name and address of the [misdemeanor] defendant, the date of violation/citation, and the criminal violation(s) charged." Am. Compl. ¶ 30. Plaintiffs contend that despite their "numerous" requests for timely access, including offers to pay for computer programing and to send employees to manually copy the records, the Judges and Lopéz have refused to turn over the information in a timely manner. *Id.* at ¶ 18. They request that "the contact information about the [misdemeanor] defendants and charges be provided within one day of issuance of the

---

[12]It is unclear from plaintiffs' amended complaint whether the information they seek is in either or both the criminal citations and charges. As several defendants point out, plaintiffs use the terms "citations" and "charges" interchangeably. The court will consider both.

- 13 -

summons or criminal case filing." *Id.* at ¶ 31.[13]

Plaintiffs allege that "[m]any misdemeanor criminal defendants . . . plead 'guilty' or 'no contest' and pay the fines imposed before an attorney can advise them of their legal options," and that "[m]any . . . believe they are unable to afford adequate legal defense, particularly those who do not receive a timely advertisement from defense counsel." *Id.* at ¶¶ 24-25. They also posit that "[c]riminal defendants from each of the defendants' courts

---

[13]The City of Arlington, where Judge Milner serves as Chief Municipal Judge, updates its website with the requested citation and court case information on a weekly basis. Plaintiffs allege that, of the 67,176 cases received since January 1, 2011, they received 0.8% of the records within 3 days of the accused violation, 32.8% within 4 to 7 days, 51.4% within 8 to 14 days, and 15% within 15 or more days. The court requires criminal defendants to enter an appearance within 30 days of the citation.

The City of Dallas, where Lopéz serves, sends a daily automated report that plaintiffs allege is not up-to-date with the most recent citations and court case information. Plaintiffs assert that, of the 135,221 cases received since January 1, 2011, they received 0.8% of the records within 3 days of the accused violation, 7.1% within 4 to 7 days, 57.6% within 8 to 14 days, and 34.5% within 15 or more days. The court requires criminal defendants to enter an appearance within 21 days of the citation.

The Dallas County Justice of the Peace Court, Precinct 1-1, where Justice Jones serves, also sends a daily automated report that plaintiffs allege is not up-to-date. Plaintiffs assert that, of the 43,011 cases received since January 1, 2011, they received 17.1% of the records within 3 days of the accused violation, 5.8% within 4 to 7 days, 5.2% within 8 to 14 days, and 71.9% in 15 or more days. The court requires criminal defendants to enter an appearance within 12 days of the citation.

The City of Fort Worth, where Judge Mares serves as Chief Municipal Judge, sends a daily automated report that plaintiffs assert is not up-to-date. Plaintiffs allege that, of the 127,383 cases received since January 1, 2011, they received 5.4% of the records within 3 days of the accused violation, 45.1% within 4 to 7 days, 44% within 8 to 14 days, and 5.5% within 15 or more days. An appearance is required by the court within 11 days of the citation.

Plaintiffs also compare these cities with the Cities of Carrollton, Grand Prairie, and Richardson. According to plaintiffs, over 85% of Carrollton's records are available within 3 days, about 85% of Grand Prairie's records are available within 7 days, and about 92% of Richardson's records are available within 3 days.

- 14 -

(Dallas, Dallas JP1-1, Arlington, and Fort Worth), upon receiving the mailers from Sullo & Bobbitt, have belatedly contacted the law firm inquiring about representation *after* the criminal defendants handled their tickets *pro se*." *Id.* at ¶ 26 (emphasis in original).

Plaintiffs suggest that the actions of Judge Milner, Judge Mares, and Lopéz (but not Justice Jones) are part of a systematic plan to "discourage persons charged with [misdemeanor] offenses from engaging the services of attorneys and pleading 'not guilty,'" because the fines imposed through these courts "provide a substantial, and growing, amount of revenues needed by the cities of Dallas, Fort Worth, and Arlington to balance their respective budgets." *Id.* at ¶ 28. Plaintiffs allege that "defendants do not typically fare well in bench trials in Defendants' courts," which allegedly have higher rates of conviction than in jury trials. *Id.* at ¶ 29.

IV

Lopéz moves to dismiss under Rule 12(b)(1), contending that plaintiffs' claim must be dismissed for lack of subject matter jurisdiction because they lack standing, they have failed to state a colorable constitutional claim, and the rights and privileges asserted are derived solely from state law.

A

The court examines first Lopéz's contention that plaintiffs lack standing. As the court has explained above, plaintiffs must allege facts demonstrating that they have "suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett*, 520 U.S. at 162 (quoting

*Lujan*, 504 U.S. at 560-61).

1

Lopéz challenges plaintiffs' standing on two grounds.  First, Lopéz asserts that plaintiffs have failed to allege an injury in fact that was caused by her conduct and that is likely to be redressed by a favorable decision.  Lopéz argues that because plaintiffs' theory rests on their First Amendment right of access, "their injury could only be lost opportunity to get business."  Lopéz Br. 19.  And because plaintiffs "never allege[d] that they received a City of Dallas record too late to contact any client before arraignment" and "[t]hey never negate[d] other means of communicating with potential clients such as television, radio, and print-media advertisements," their injury is speculative.  *Id.*  Lopéz maintains that "since Plaintiffs identify no concrete injury, they of course allege 'no causal connection between the injury and the conduct complained of'" and "fail[] to demonstrate that any 'injury will be redressed by a favorable decision.'"  *Id.* at 20 (quoting *Lujan*, 504 U.S. at 560).

The court disagrees and holds that plaintiffs have standing to assert their claim against Lopéz.  Plaintiffs have alleged a deprivation of their constitutional rights that has already occurred as a result of Lopéz's alleged failure to timely produce court records and documents, and these injuries are likely to be redressed by a favorable decision, i.e., by declaratory relief.  And contrary to Lopéz's contention, to establish the element of injury, plaintiffs need not further demonstrate the loss of business opportunities, because a violation of their constitutional rights is sufficient.  *Cf., e.g., Ray Baillie Trash Hauling, Inc. v. Kleppe*, 477 F.2d 696, 701 (5th Cir. 1973) ("In general, to have standing to litigate, a party must show

- 16 -

that he has incurred, or is in immediate danger of incurring, some direct and personal injury resulting from the violation of a constitutional or statutory right designed to protect that party.").

2

Second, Lopéz argues that plaintiffs are asserting the right of unascertained potential clients. For example, plaintiffs allege that "[m]any criminal defendants believe they are unable to afford adequate legal defense, particularly those who do not receive a timely advertisement from defense counsel" and suggest that this could explain why "[m]any misdemeanor criminal defendants . . . plead 'guilty' or 'no contest.'" Am. Compl. ¶¶ 24-25. Plaintiffs also allege that the delayed access to records caused by the Judges and Lopéz "implicates the interests of criminal and traffic defendants in receiving timely information about legal representation," that defendants "cannot deprive them of critical information which might assist the criminal defendants to exercise even a qualified right," and "[t]he effect of [their] policies and procedures, if not its intent, is to make it more difficult for criminal defendants to get legal representation." *Id.* at ¶ 43.

Although Lopéz is correct that plaintiffs' claim should be dismissed to the extent they are attempting to assert the rights of potential unascertained clients, *see Kowalski v. Tesmer*, 543 U.S. 125, 134 (2004), plaintiffs are not in fact asserting such rights. *See, e.g.,* Am. Compl. ¶ 23 (stating that plaintiffs "recognize the state of the law and [are] not claim[ing] standing in this case to independently pursue protection of the rights of these criminal defendants"). Instead, plaintiffs base this claim on alleged violations of their First and

Fourteenth Amendment rights to access and commercial free speech.  They refer to the interests of the misdemeanor defendants because several cases have viewed this as a supporting principle for the right of attorney advertising, a component of commercial free speech.  For example, in *Ficker* the court considered the "interests of criminal and traffic defendants in receiving information about legal representation" in holding that a law prohibiting targeted direct-mail solicitation by attorneys of criminal and traffic defendants within 30 days of arrest violated the attorneys' First Amendment right to free speech.  *Ficker*, 119 F.3d at 1153, 1156.  And in *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977), in rejecting proffered justifications for a law that prohibited attorney advertising and holding that the law violated the First Amendment, the Court noted that "[a]dvertising is the traditional mechanism in a free-market economy for a supplier to inform a potential purchaser of the availability and terms of exchange."  *Id.* at 376, 379 & 384.  *Bates* also referred to *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976), which declared unconstitutional a statute that subjected a pharmacist who advertised prescription drug prices to sanctions.  *Bates*, 433 U.S. at 363.  In holding that the commercial speech was protected under the First Amendment, the Court in *Virginia State Board of Pharmacy* stated that the "listener's interest" for pharmaceutical advertisements was "substantial" because "the consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue," "commercial speech serves to inform the public of the availability, nature, and prices of products and services, and thus performs an indispensable role in the allocation of resources

in a free enterprise system," and "such speech serves individual and societal interests in assuring informed and reliable decisionmaking." *See Bates*, 433 U.S. at 364 (citing *Va. State Board of Pharmacy*, 425 U.S. at 761-65).

Accordingly, the court rejects Lopéz's challenge to plaintiffs' standing.

B

The court turns next to Lopéz's contention, based on *Bell v. Hood*, 327 U.S. 678 (1946), that the court lacks subject matter jurisdiction because plaintiffs fail to state a colorable constitutional claim.

*Bell* distinguishes between dismissal for want of jurisdiction and dismissal on the merits. "Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." *Id.* at 682. Instead, dismissal on this ground is "a judgment on the merits and not for a dismissal for want of jurisdiction." *Id.* A suit "may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Id.* at 682-83. But "[d]ismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Oneida Indian Nation v. Cnty. of Oneida, N.Y.*, 414 U.S. 661, 666 (1974)). "Thus a complaint properly asserting a federal claim can

be dismissed for lack of jurisdiction only if it is wholly insubstantial and frivolous or patently without merit." *Al-Juburi v. Chertoff*, 2007 WL 2285964, at *2 (N.D. Tex. Aug. 9, 2007) (Fitzwater, J.) (quoting *Rogers v. Brockette*, 588 F.2d 1057, 1062 n.9 (5th Cir.1979); *Emp'rs Ins. of Wausau v. Suwannee River Spa Lines, Inc.*, 866 F.2d 752, 759-60 (5th Cir.1989)) (internal quotation marks omitted).

Viewed under the controlling standard, the court is unable to say that all components of plaintiffs' claims against Lopéz are subject to dismissal for lack of subject matter jurisdiction.

## C

The court now considers Lopéz's contention that plaintiffs are asserting rights and privileges that are derived solely from state law.

In *Wright v. Mahan*, 478 F. Supp. 468 (E.D. Va. 1979), plaintiffs alleged that their First and Fourteenth Amendment rights to an initiative election, to a place on the ballot in that election, and to vote had been denied without due process. *See id.* at 471. The court dismissed for want of jurisdiction, holding that the plaintiffs were asserting a right that was "a wholly State created right" and "not a right secured by the federal Constitution or by an Act of Congress providing for equal rights." *Id.* at 474. *Wright* is not controlling here. In fact, several courts have recognized a First Amendment right of access to certain court records and documents. *See, e.g., United States v. Edwards*, 823 F.2d 111, 113 (5th Cir. 1987) (holding that "the first amendment guarantees the public and press a qualified right of access to the record of [midtrial] proceedings" questioning jurors regarding potential

misconduct); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006) ("[I]t is well established that the public and the press have a 'qualified First Amendment right to attend judicial proceedings and to access certain judicial documents'") (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004)).  And Lopéz does not cite any authority that wholly rejects First Amendment protection over the court records and documents in question.  Thus it does not appear that plaintiffs are suing on a wholly state-created right.

Accordingly, the court rejects Lopéz's contention that the court lacks subject matter jurisdiction because plaintiffs are asserting rights and privileges that are derived solely from state law.

V

The court considers next the motions of the Judges and Lopéz to dismiss plaintiffs' suit under Rule 12(b)(6) for failure to state a claim on which relief can be granted.

To survive their Rule 12(b)(6) motions, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff[s] plead[] factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that [the] defendant[s] ha[ve] acted unlawfully."  *Id.; see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief

above the speculative level[.]").  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (alteration omitted) (quoting Rule 8(a)(2)).

Furthermore, under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Id.*  Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' . . . [a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "Nor [will] a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

Plaintiffs' claims in this suit are asserted under § 1983.  "Section 1983 creates a private right of action for redressing the violation of federal law by those acting under color of state law."  *Colson v. Grohman*, 174 F.3d 498, 504 n.2 (5th Cir. 1999).  "Rather than creating substantive rights, § 1983 simply provides a remedy for the rights that it designates. Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983."  *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (citations and internal quotation marks omitted) (quoting *Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1573 (5th Cir. 1989)).

When analyzing a § 1983 claim, the court must first "identify the specific constitutional right allegedly infringed."  *Albright v. Oliver*, 510 U.S. 266, 271 (1994)

(quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Baker v. McCollan*, 443 U.S. 137, 140 (1979)).  "The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right[.]"  *Graham*, 490 U.S. at 394.

VI

Plaintiffs allege that the actions of the Judges and Lopéz unconstitutionally restrain their First and Fourteenth Amendment rights to commercial free speech.

The actions of the Judges and Lopéz do not implicate plaintiffs' First Amendment commercial free speech rights.  "This is not a case in which the government is prohibiting a speaker from conveying information that the speaker already possesses."  *See L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 40 (1999) (holding that statute that limited access to arrestee information did not implicate plaintiffs' right to free speech but simply involved denial of access); *cf. Houchins v. KQED, Inc.*, 438 U.S. 1, 9-12 (1978) (distinguishing between First Amendment right to communicate information that has been obtained and asserted right to access government information on demand, which is not necessarily guaranteed under the First Amendment).  Instead, plaintiffs' claim is more properly analyzed as a restriction on access to court records.  *Cf. United Reporting*, 528 U.S. at 40.

Accordingly, to the extent plaintiffs' claim is based on the assertion of First Amendment free speech rights, it is dismissed as to the Judges and Lopéz.[14]

--------

[14]Justice Jones and Lopéz made this argument in their motions. Although Judges Milner and Mares did not, the court raises *sua sponte* that they are also entitled to dismissal

VII

Plaintiffs also allege that the Judges and Lopéz violated their First and Fourteenth Amendment rights of access. The Judges and Lopéz contend that there is no right to obtain government information generally and that plaintiffs cannot demonstrate that the First Amendment attaches specifically to the court records and documents at issue in this case.

A

In general, the public and press do not have a constitutional right of access to information in the government's possession. *See KQED*, 438 U.S. at 15 ("Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to *government information* or sources of information within the government's control.") (emphasis added); *In re Bos. Herald, Inc.*, 321 F.3d 174, 180 (1st Cir. 2003) ("There is no general constitutional right of access to information in the government's possession."); *cf. United Reporting*, 528 U.S. at 40 (holding that "California could decide not to give out arrestee information at all without violating the First Amendment" because the arrestee information was government information). But to the extent that plaintiffs are requesting *court records and documents*, "[t]his implicates a separate line of cases addressing the right of access." *See Am. Civil Liberties Union v. Holder*, 652 F.Supp.2d 654, 660 (E.D. Va. 2009), *aff'd*, 673 F.3d 245 (4th Cir. 2011).

In determining whether the public and press enjoy a First Amendment right of access

---

on this basis. Because the court is allowing plaintiffs to replead and address this deficiency, if they can, the procedure employed here is fair. *See supra* note 11.

to certain criminal *proceedings*, the Supreme Court has developed a two-part test—the "experience" and "logic" test—that examines (1) whether the proceeding has historically been open to the press and general public and (2) whether public access plays a significant positive role in the functioning of the proceeding in question. *See Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 8 (1986) ("*Press-Enter. II*").[15]  If the proceeding passes the "experience" and "logic" test, the First Amendment right of access attaches and there is a presumption that the proceeding should remain open. *See id.* at 9; *see Hearst Newspapers, L.L.C. v. Cardenas-Guillen*, 641 F.3d 168, 181 (5th Cir. 2011).

> [T]he presumption may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Press-Enter. II*, 478 U.S. at 9-10 (quoting *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 510 (1984)) (internal quotation marks omitted).

The Supreme Court and the Fifth Circuit have not directly addressed whether the First

---

[15]Courts have applied this test and recognized a qualified First Amendment right of access to various criminal proceedings. *See, e.g., El Vocero de P.R.(Caribbean Int'l News Corp.) v. Puerto Rico*, 508 U.S. 147, 149-50 (1993) (per curiam) (trial-like preliminary hearings); *Press-Enter. II*, 478 U.S. at 10 (preliminary hearings as conducted in California); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604-06 (1982) (trial); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576-77 (1980) (trial); *Hearst Newspapers, L.L.C. v. Cardenas-Guillen*, 641 F.3d 168, 176 (5th Cir. 2011) (sentencing proceedings); *United States v. Chagra*, 701 F.2d 354, 363-64 (5th Cir. 1983) (pretrial bond reduction hearing); *but see Edwards*, 823 F.2d at 117-18 (holding that First Amendment right of access does not attach to mid-trial questioning of jurors about potential misconduct, but that First Amendment guaranteed qualified right of access to proceeding records).

- 25 -

Amendment right of access extends to court records and documents.[16]  *See, e.g., United States v. Gonzales*, 150 F.3d 1246, 1256 (10th Cir. 1998) (Supreme Court); *Applications of Nat'l Broad. Co. v. Presser*, 828 F.2d 340, 351 (6th Cir. 1987) (same); *United States v. Carriles*, 654 F.Supp.2d 557, 571 (W.D. Tex. 2009) (Fifth Circuit).  And although it is well recognized that there is a qualified common law right to inspect and copy court records and documents, *see, e.g., Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978); *SEC v. Van Waeyenberghe*, 990 F.2d 845, 848 (5th Cir. 1993), plaintiffs do not sue on the basis of a common law right; they rely instead on alleged First and Fourteenth Amendment rights.  Several circuits, however, have held that the First Amendment guarantees access to certain court records and documents placed in evidence or filed in court and have applied the "experience" and "logic" test to determine the scope of the right.  *See, e.g., Bos. Herald*, 321 F.3d at 182-83 (recognizing qualified First Amendment right of access to certain judicial proceedings and documents, and that the "experience" and "logic" test determined whether First Amendment right attached to particular class of documents or proceedings requested); *Lugosch*, 435 F.3d at 120 (stating that "it is well established that the public and the press have a 'qualified First Amendment right to attend judicial proceedings and to access certain

---

[16]Plaintiffs contend that the Fifth Circuit "reiterated this 1st Amendment right of access to court proceedings and court records" in *Hearst Newspapers*."  Ps. Nov. 30, 2011 Br. 7; Ps. Dec. 2, 2011 Br. 8.  The court disagrees.  *Hearst Newspapers* only recognized a First Amendment right of access to *criminal proceedings*, not to court records.  *See id.* at 176.  And although the Fifth Circuit stated that other "courts of appeals have also recognized a First Amendment right of access to documents filed for use in sentencing proceedings," it did not indicate that it also recognized such a right; instead, the panel applied a more limited "right of access to sentencing proceedings."  *Id.*

judicial documents,'" and that there are "two different approaches for determining whether 'the public and the press should receive First Amendment protection in their attempts to access certain judicial documents,'" one of which is the "experience" and "logic" test) (quoting *Hartford Courant*, 380 F.3d at 91-92); *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994) ("The public's right of access to court proceedings and documents is well-established . . . .  The First Amendment presumes that there is a right of access to proceedings and documents which have 'historically been open to the public' and where the disclosure of which would serve a significant role in the functioning of the process in question [(i.e., the "experience" and "logic" test)].") (citations omitted), *superseded on other grounds as recognized by Bond v. Utreras*, 585 F.3d 1061, 1068 n.4 (7th Cir. 2009); *In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 573 (8th Cir. 1988) (recognizing that "[t]he Supreme Court has not addressed the question whether the first amendment right of public access extends to *documents*," and, after applying the "experience" and "logic" test, holding that court was "persuaded that the first amendment right of public access does extend to the documents filed in support of search warrant applications") (emphasis in original); *United States v. Bus. of Custer Battlefield Museum & Store Located at Interstate 90, Exit 514, S. of Billings, Mont.*, 658 F.3d 1188, 1192 (9th Cir. 2011) ("The law recognizes two qualified rights of access to judicial proceedings and records, a common law right 'to inspect and copy public records and documents, including judicial records and documents' and 'a First Amendment right of access to criminal proceedings' and documents therein[.]") (quoting *Nixon*, 435 U.S. at 597;

*Press-Enter. II*, 478 U.S. at 8); *United States v. El-Sayegh*, 131 F.3d 158, 160 (D.C. Cir. 1997) ("The First Amendment guarantees the press and the public access to aspects of court proceedings, including documents, 'if such access has historically been available, and serves an important function of monitoring prosecutorial or judicial misconduct [(i.e., the "experience" and "logic" test)].'") (quoting *Wash. Post v. Robinson*, 935 F.2d 282, 288 (D.C. Cir. 1991)).  And when the Fifth Circuit was faced with the opportunity to recognize First Amendment protection over a court record, it held that "the first amendment guarantee[d] a limited right of access to the record of closed proceedings concerning potential jury misconduct," i.e., a court record.  *Edwards*, 823 F.2d at 118.

Based on the foregoing, and absent contrary Supreme Court and Fifth Circuit precedent, the court holds that the public and press have a qualified First Amendment right of access to court records and documents if access has historically been available to the press and public, and it plays a significant positive role in the functioning of the particular process in question.  *See Press-Enter. II*, 478 U.S. at 8 (quoting *Globe Newspaper*, 457 U.S. at 606).

## B

Lopéz argues that "[a]t the early stages of [a] citation, before there is even a criminal case, and before the very commencement of a criminal case at arraignment," plaintiffs do not have a right to the citation because it is not yet a court document.  *See* Lopéz Br. 17.[17]

_____

[17]Lopéz makes this argument under one of her challenges to the court's subject matter jurisdiction.  She also contends in support of her Rule 12(b)(6) motion that, "[a]s demonstrated above, on the facts here pleaded, the Plaintiffs have no First Amendment right to obtain government information generally or pre-arraignment criminal court information

Plaintiffs allege that the "police citations" are in the possession of "either the police/sheriff" and "are used to create the criminal court case." Am. Compl. ¶¶ 19-20. They also assert that the Judges and Lopéz acknowledge that the citations are "records of the judiciary" for purposes of the Texas Public Information Act. *See id.* at ¶ 19. The court holds that the amended complaint fails to adequately plead that police citations in the possession of the police or sheriff qualify as court records or documents. *Cf. Jessup v. Luther*, 277 F.3d 926, 928-29 (7th Cir. 2002) (holding that although settlement agreements and arbitrations generally are private documents not subject to a right of access, a document is presumptively public when it is filed in court record); *El-Sayegh*, 131 F.3d at 162-63 (holding that there is no First Amendment or common law right of access to documents that played no role in judicial decision).[18] Without such allegations, the court cannot draw the reasonable inference that plaintiffs have a First Amendment right of access to the citation, given that there is no generic First Amendment right of access to government information. *See, e.g., Houchins*, 438 U.S. at 15. A state can decide not to disclose governmental information at all without

_____

specifically." Lopéz Br. 21. The court has construed this contention as incorporating her arguments in support of her challenge to the court's subject matter jurisdiction. The Judges do not include this ground in their motions to dismiss.

[18]Plaintiffs state in their brief that "[t]he Defendants in this case have decided to turn over the police citations to their municipal courts and not provide ongoing police department access to the citations" because the Texas Public Information Act "does not apply to 'the judiciary.'" *See* Ps. Dec. 2, 2011 Br. 17 (quoting Tex. Gov't Code Ann. § 552.003(1)(B) (West 2003)). Even if plaintiffs were to add this allegation to their amended complaint it would still be unclear whether the citations qualify as court records or documents given that the generic term "turn over" can refer to something other than a court filing.

violating the First Amendment.  *See United Reporting*, 528 U.S. at 40 (holding that because case was "nothing more than a governmental denial of access to information in its possession," "California could decide not to give out arrestee information at all without violating the First Amendment").

The court dismisses the claim against Lopéz to the extent it is based on the failure to provide information about citations.  *See Albright*, 510 U.S. at 268, 271 & 275 (affirming Rule 12(b)(6) dismissal of substantive due process claim).  Because the Judges have not made this specific argument, the court raises *sua sponte* that they are also entitled to dismissal on this basis.[19]

C

Setting citations to one side, the remaining documents at issue are criminal charges and other court filings.  Lopéz contends that plaintiffs have failed to allege the first prong of the "experience" and "logic" test, which examines whether there is a history of access to the requested court records.[20]  The Judges do not raise this argument in their motions to dismiss,[21] and plaintiffs therefore do not respond to it in their brief.

The court agrees with Lopéz that the amended complaint does not adequately address

---

[19]*See supra* note 11.

[20]*See supra* note 17.

[21]In his motion to dismiss, Justice Jones "[a]ssum[ed] *arguendo* that Plaintiffs do have a traditional right of access to court documents."  Justice Jones Br. 6.  In his reply brief, he asserts that "Plaintiffs do not meet the first prong of *Press[-]Enterprise*."  Justice Jones Reply 4.  The court therefore raises this ground *sua sponte*.  *See supra* note 11.

this prong.  Plaintiffs allege that "prompt access to such records is guaranteed by the 1st Amendment to the United States Constitution."  *See* Am. Compl. ¶ 22.  They also cite *Courthouse News Service v. Jackson*, 2009 WL 2163609 (S.D. Tex. July 20, 2009), which entered a preliminary injunction requiring a district clerk's office to provide a legal news service same-day access to new civil petition filings.  *See id.* at *1-2.  Because the parties in *Courthouse News* "agree[d] that there is a right of access to newly-filed petitions in civil cases," the court did not decide whether the right of access attached to the requested court documents under the "experience" and "logic" test but instead assumed its application.  *See id.* at *4.  Thus *Courthouse News* does not establish that access to court records and documents is guaranteed under the First Amendment, and plaintiffs must plead sufficient facts to enable the court to draw the reasonable inference that each prong of the "experience" and "logic" test is satisfied.

Accordingly, plaintiffs' second claim must be dismissed against Lopéz.  The court raises *sua sponte* that the Judges are also entitled to dismissal based on plaintiffs' failure to satisfy the first prong.[22]

## D

The Judges and Lopéz contend that plaintiffs have failed to adequately allege the second prong of the "experience" and "logic" test, which considers whether access plays a significant positive role in the actual functioning of the proceeding in question.  They raise

---

[22]*See supra* note 11.

this ground for different reasons.  Lopéz focuses on the immediacy that plaintiffs request, asserting that "[p]laintiffs do not allege facts showing that next-day or immediate and contemporaneous public access to pre-arraignment records would play a significant positive role in the actual functioning of the judicial process," and that "[t]he First Amendment is satisfied if court records are released within a reasonable time."  Lopéz Br. 17.  The Judges appear to focus on plaintiffs' use of the information, contending that plaintiffs are unable to demonstrate that access to court records for the purpose of sending out advertisements plays a significant role in the functioning of the judicial process.  Justice Jones, in particular, argues that "granting access to [misdemeanor] defendants' home addresses in order to target them with unsolicited advertising does not create 'a significantly positive role in the actual functioning of the judicial process'" and "does not '[serve] to promote trustworthiness of the judicial process, [curb] judicial abuses, [nor provide] the public with a more complete understanding of the judicial system, including a better perception of its fairness'" but instead "merely advances Plaintiffs' private commercial interest[s,] rather than a public interest." Justice Jones Br. 6-7 (alterations in original) (quoting *Press-Enter. II*, 478 U.S. at 7; *Van Waeyenberghe*, 990 F.2d at 849).

Plaintiffs allege that the actions of the Judges and Lopéz "implicate[] the interests of criminal and traffic defendants in receiving timely information about legal representation" and "make it more difficult for criminal defendants to get legal representation."  Am. Compl. ¶ 43.  In their briefing, plaintiffs argue that access to the court records and documents "facilitates communication by attorneys, such as Plaintiffs, in being able to offer inexpensive

legal services, [which] contribut[es] not only to the functioning of the judicial process, but to the fact and appearance of justice in that process." Ps. Nov. 30, 2011 Br. 7; Ps. Dec. 2, 2011 Br. 8. In support, plaintiffs rely on *Bates* and *Peel v. Attorney Registration & Disciplinary Commission*, 496 U.S. 91 (1990). In *Bates* the Court held that a state statute that prohibited advertising by attorneys violated the First Amendment. *See Bates*, 433 U.S. at 383-84. In rejecting justifications for the statute, the Court explained that advertising by attorneys "may offer great benefits" since "[a]dvertising is the traditional mechanism in a free-market economy for a supplier to inform a potential purchaser of the availability and terms of exchange," in order for the legal profession to better serve the population. *See id.* at 376. And in *Peel* the Court reiterated that "[i]nformation about certification and specialties facilitates the consumer's access to legal services and thus better serves the administration of justice." *Peel*, 496 U.S. at 110.

The court holds that plaintiffs have alleged a plausible basis for the court to draw the reasonable inference that access to the contact information of misdemeanor defendants, as found in criminal charges and court filings, plays a significant positive role in the actual functioning of the adjudication of misdemeanor offenses by facilitating a misdemeanor defendant's access to legal services. *See, e.g., Bos. Herald*, 321 F.3d at 182 (examining under second prong whether public access to court document "plays a significant positive role in the functioning of the particular process in question") (quoting *Press-Enter. II*, 478 U.S. at 8). Moreover, access to these documents is derived from the public nature of misdemeanor trials. *See Lugosch*, 435 F.3d at 120 (explaining that the second prong

"considers the extent to which the judicial documents are 'derived from or [are] a necessary corollary of the capacity to attend the relevant proceeding.'") (alteration in original); *Hartford Courant*, 380 F.3d at 93 ("[T]he right to inspect documents derives from the public nature of particular tribunals.").

## VIII

Assuming *arguendo* that plaintiffs have adequately alleged a constitutional violation, they must also sufficiently plead municipal liability under § 1983 because "a suit against a governmental officer 'in his official capacity' is the same as a suit 'against [the] entity of which [the] officer is an agent.'" *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 785 n.2 (1997) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)) (alteration in original and internal quotation marks omitted); *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 n.55 (1978).

## A

A municipality is a "person" subject to suit under § 1983 under certain circumstances. *See Monell*, 436 U.S. at 690. Although a municipality cannot be held liable simply on a theory of *respondeat superior*, *id.* at 691, it can be held liable if a deprivation of a constitutional right was inflicted pursuant to an official policy or custom, *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001).[23] Municipal liability requires proof of three

---

[23]"[T]he 'policy or custom' requirement also applies when plaintiffs seek prospective relief, such as an injunction or a declaratory judgment." *L.A. Cnty., Cal. v. Humphries*, 131 S.Ct. 447, 449 (2010).

elements: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Valle v. City of Hous.*, 613 F.3d 536, 541-42 (5th Cir. 2010) (quoting *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002)) (internal quotation marks omitted).

The first element requires that plaintiffs adequately plead an official policy or custom. "[A] policy can be shown through evidence of an actual policy, regulation, or decision that is officially adopted and promulgated by lawmakers or others with policymaking authority." *Id.* at 542 (citing *Burge v. St. Tammany Parish*, 336 F.3d 363, 369 (5th Cir. 2003)). Although a "single decision by a policy maker may, under certain circumstances, constitute a policy for which a municipality may be liable[,] . . . this 'single incident exception' is extremely narrow and gives rise to municipal liability only if the municipal actor is a final policymaker." *Id.* (citations, brackets, and internal quotation marks omitted). A custom is "a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc) (per curiam)).

To satisfy the second element, the plaintiff must adequately plead that "actual or constructive knowledge of a custom [is] attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Valle*, 613 F.3d at 542 (brackets omitted) (quoting *Webster*, 735 F.2d at 842); *Piotrowski*,

237 F.3d at 579 (same citation and changes).   Liability attaches only when a final policymaker (as distinguished from a final decisionmaker), who has "the responsibility for making law or setting policy in any given area of a local government's business," establishes the municipal policy with respect to the action ordered.  *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988); *see also Jett v. Dall. Indep. Sch. Dist.*, 7 F.3d 1241, 1247 (5th Cir. 1993) (explaining distinction between final policymaking authority and mere decisionmaking); *Bolton v. City of Dall., Tex.*, 541 F.3d 545, 548-49 (5th Cir. 2008) (per curiam) ("Our analysis must also take into account the difference between final decisionmaking authority and final policymaking authority, a distinction that this circuit recognized as fundamental . . . . [D]iscretion to exercise a particular function does not necessarily entail final policymaking authority over that function.") (citations omitted).

The third element requires that the plaintiff adequately plead that the municipal policy or custom was the "moving force" of the constitutional deprivation, which requires a "high threshold of proof."  *Piotrowski*, 237 F.3d at 580 (citing *Monell*, 436 U.S. at 694). The "plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  *Valle*, 613 F.3d at 542 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)) (internal quotation marks omitted).  Plaintiffs therefore "must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision."  *Id.* (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 411) (internal quotation marks omitted); *see also*

*Piotrowski*, 237 F.3d at 579 ("[E]ven a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result.") (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 407). Simple or even heightened negligence, however, is insufficient to meet the deliberate indifference requirement. *Piotrowski*, 237 F.3d at 579 (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 407).

B

The court turns first to plaintiffs' claims against Judge Milner.  Judge Milner contends that plaintiffs have failed to allege an official policy or custom.  The court agrees that plaintiffs have not alleged *a policy* that was officially adopted and promulgated by individuals with policymaking authority, but they do allege *a custom* of delayed access to the contact information of misdemeanor defendants.  In particular, they assert that the City of Arlington, where Judge Milner serves, releases 0.8% of the misdemeanor defendants' records within 3 days of the accused violation, 32.8% within 4 to 7 days, 51.4% within 8 to 14 days, and 15% after 15 or more days.  And plaintiffs need only adequately plead a policy *or* custom to satisfy the first element of municipal liability.  *See Valle*, 613 F.3d at 541 (requiring either an official policy or custom).

Judge Milner next argues that plaintiffs have failed to allege that he acted with deliberate indifference to the risk of the constitutional violation.  "'[D]eliberate indifference' is a stringent standard of fault;" "[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or

- 37 -

statutory right will follow the decision." *Bd. of Cnty. Comm'rs*, 520 U.S. at 410-11.  Simple or even heightened negligence is insufficient to meet this requirement.  *Piotrowski*, 237 F.3d at 579 (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 407).  The court holds that the amended complaint is sufficient for the court to draw the reasonable inference that Judge Milner was deliberately indifferent to whether plaintiffs had a right of access to the requested court records and documents.  Plaintiffs allege—and the court must accept the facts alleged as true—that Judge Milner was intent on discouraging misdemeanor defendants from obtaining legal representation and instead paying their fine to the City of Arlington before an attorney could provide legal guidance, because the fines provided a substantial and growing source of revenue for the city, and this motivation caused Judge Milner to be deliberately indifferent to plaintiffs' "numerous" requests for timely access and offers of assistance.  *See* Am. Compl. ¶¶ 18, 28; *see also Valle*, 613 F.3d at 542.

Accordingly, the court rejects Judge Milner's arguments against municipal liability.[24]

## C

The court examines next plaintiffs' claims against Justice Jones.  Justice Jones asserts that plaintiffs have failed to "allege the existence of an official custom or policy by Justice Jones, as an official policymaker, that was the moving force behind any alleged infringement of Plaintiffs' constitutional rights."  Justice Jones Br. 8.

---

[24]Judge Milner does not present in his motion to dismiss any arguments contesting plaintiffs' allegation that he is an official policymaker for the City of Arlington.  *See Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992) (recognizing that municipal judge may be deemed a policymaker for "actions taken pursuant to his or her administrative role").

Plaintiffs allege that the Dallas County Justice of the Peace Court, Precinct 1-1, where Justice Jones serves, sends 17.1% of the misdemeanor defendants' records within 3 days of the accused violation, 5.8% within 4 to 7 days, 5.2% within 8 to 14 days, and 71.9% in 15 or more days. As the court held above, these allegations are sufficient to state a custom of delayed access to the contact information of misdemeanor defendants.

But plaintiffs have failed to adequately allege that Justice Jones is a policymaker.[25] Although they assert that he is the "officer exercising administrative policy-making and control over the release of information from court records from his court," Am. Compl. ¶ 6(c), "[t]he Fifth Circuit has found that, unlike that of a County Judge, the job of a Texas Justice of the Peace does not involve policymaking functions, but primarily involves the adjudication of small claims." *Tinoco v. Raleeh*, 2006 WL 27287, at *3 (E.D. Tex. Jan. 5, 2006) (dismissing § 1983 claim in response to motion to dismiss) (citing *Bigford v. Taylor*, 834 F.2d 1213, 1222) (5th Cir. 1988)). The court therefore holds that plaintiffs have failed to plead liability against Dallas County (or any other entity) for Justice Jones's actions.

## D

The court considers next plaintiffs' claims against Judge Mares. Judge Mares asserts the same arguments as does Judge Milner, contending that plaintiffs have failed to allege an official policy or custom, and that Judge Mares acted with deliberate indifference to the risk

---

[25]Because it is unclear whether Justice Jones asserts that he is entitled to dismissal on the precise basis that he was not an official policymaker of Dallas County, the court raises this ground *sua sponte. See supra* note 11.

of the constitutional violation.

The court rejects these arguments.  Plaintiffs have alleged a custom of delayed access to the contact information of misdemeanor defendants.  According to the amended complaint, Fort Worth, where Judge Mares serves, sends 5.4% of the misdemeanor defendants' records within 3 days of the accused violation, 45.1% within 4 to 7 days, 44% within 8 to 14 days, and 5.5% after 15 or more days.  Plaintiffs have also alleged that Judge Mares was deliberately indifferent to plaintiffs' rights because she was motivated by the revenue gained on behalf of the City of Fort Worth, an allegation that the court must accept as true.[26]

E

The court turns last to plaintiffs' claim against Lopéz.  Lopéz asserts that plaintiffs have failed to allege an official policy or custom, that she is not an official policymaker for the City of Dallas because the City Council is the only policymaker for the City, and that plaintiffs did not allege a causal relationship between an alleged policy and the alleged constitutional violation.

The court holds that plaintiffs have alleged each element of municipal liability against Lopéz.  Plaintiffs allege a custom of delayed access to the contact information of misdemeanor defendants, asserting that, in the City of Dallas, where Lopéz serves, 0.8% of the misdemeanor defendants' records were provided within 3 days of the accused violation,

---

[26]Judge Mares does not assert in her motion to dismiss any arguments contesting plaintiffs' allegation that she is an official policymaker for the City of Fort Worth.  *See supra* note 24.

7.1% within 4 to 7 days, 57.6% within 8 to 14 days, and 34.5% after 15 or more days. Plaintiffs also allege that Lopéz is "the officer exercising administrative policy-making and control over the release of information from municipal court records of the City of Dallas," Am. Compl. ¶ 6(b), which is sufficient for the court to draw the reasonable inference that Lopéz has responsibility to set municipal policy with respect to the administrative action ordered, and Lopéz has not asserted a sufficient basis to conclude otherwise.[27] And plaintiffs have alleged that, by delaying the distribution of the misdemeanor defendants' contact information in order to raise revenue for the City of Dallas, Lopéz directly caused plaintiffs' constitutional deprivation and was deliberately indifferent to their rights. *See Valle*, 613 F.3d at 542.

## IX

Plaintiffs state in their claim against the Judges and Lopéz that they "are entitled under 28 U.S.C. section 2201 to declaratory judgment protecting Plaintiffs['] rights sought in this suit, and, if necessary, ancillary injunctive relief under 28 U.S.C. section 2202." Am. Compl. ¶ 44.

Justice Jones and Lopéz move for dismissal of the request for injunctive relief,

---

[27]Lopéz asserts that *Bolton* stands for the proposition that the City Council is the only policymaker for the City of Dallas. *Bolton* recognized that the City Council had policymaking authority, but it held that the defendant (the Dallas City Manager) was merely a final decisionmaker because state and local law "[did] not show that the Charter or the city council delegated policymaking power to the city manager." *Bolton*, 541 F.3d at 550. But *Bolton* was a summary judgment case, and the court was able to resolve on the record before it who was and was not a policymaker for purposes of § 1983 liability. The court is unable to do so on the present Rule 12(b)(6) record.

asserting that plaintiffs have not alleged facts demonstrating their entitlement to such relief.
In particular,

> a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Judges Milner and Mares do not raise this argument in their motions to dismiss. Plaintiffs assert in response that they are not pleading for injunctive relief but are merely stating that they "may seek ancillary injunctive relief if such become[s] necessary . . . to enforce the sought-after declaratory judgment," as permitted under 28 U.S.C. § 2202. *See* Ps. Nov. 30, 2011 Br. 14 (emphasis omitted); Ps. Dec. 2, 2011 Br. 20 (emphasis omitted).

Contrary to Justice Jones and Lopéz's contentions, plaintiffs are not presently requesting injunctive relief, given that they only state that they are "entitled" to injunctive relief under § 2202[28] and pray solely for declaratory relief.[29] *See* Am. Compl. ¶ 45(b). If the court grants a declaratory judgment in plaintiffs' favor, plaintiffs are authorized under § 2202

---

[28]Section 2202 states: "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." *Id.*

[29]But if plaintiffs were seeking injunctive relief, they would be required to allege that they are entitled to an injunction under the *eBay* test.

to seek further relief, such as an injunction, to "protect or effectuate" the declaratory judgment.  *See Samuels v. Mackell*, 401 U.S. 66, 72 (1971) ("[A] declaratory judgment . . . might serve as the basis for a subsequent injunction against those proceedings to 'protect or effectuate' the declaratory judgment[.]") (citing § 2202); *see also Powell v. McCormack*, 395 U.S. 486, 499 (1969) ("A declaratory judgment can then be used as a predicate to further relief, including an injunction") (citing § 2202); *Pub. Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 245 (1952) ("A declaratory judgment may be the basis of further relief necessary or proper against the adverse party[.]") (citing § 2202).  And if they later choose to rely on the declaratory judgment as a predicate for injunctive relief, they will then be required to establish the elements for a permanent injunction under the *eBay* test.  *See Shoom, Inc. v. Elec. Imaging Sys. of Am., Inc.*, 2011 WL 4595212, at *1-2 (N.D. Cal. Oct. 4, 2011) (holding that because plaintiff was requesting injunctive relief to enforce declaratory judgment, it must satisfy the four-part test to establish entitlement to injunctive relief).

Accordingly, the court rejects Justice Jones and Lopéz's argument against plaintiffs' prayer for relief.

## X

Although the court is dismissing plaintiffs' claims, it will permit them to replead.  *See In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567-68 (N.D. Tex. 2005) (Fitzwater, J.) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that

will avoid dismissal.") (internal quotation marks and citation omitted).  Because plaintiffs have not stated that they cannot, or are unwilling to, cure the defects that the court has identified, the court grants them 30 days from the date this memorandum opinion and order is filed to file an amended complaint.  Moreover, allowing plaintiffs to amend their complaint will ensure that the court has employed a fair procedure in raising dismissal *sua sponte*.  *See supra* note 11.

\* \* \*

For the reasons explained, the court grants the Attorney General's November 10, 2011 Rule 12(b)(1) motion to dismiss based on lack of Article III standing.  The court denies Lopéz's November 11, 2011 Rule 12(b)(1) motion to dismiss.  The court grants Justice Jones's November 9, 2011 Rule 12(b)(6) motion to dismiss, Lopéz's November 11, 2011 Rule 12(b)(6) motion to dismiss, Judge Milner's November 11, 2011 Rule 12(b)(6) motion to dismiss, and Judge Mares' November 9, 2011 Rule 12(b)(6) motion to dismiss, on grounds raised in the motions or on grounds raised *sua sponte*.  The court grants plaintiffs 30 days from the date this memorandum opinion and order is filed to file an amended complaint.

**SO ORDERED.**

July 10, 2012.

_Sidney A. Fitzwater_
SIDNEY A. FITZWATER
CHIEF JUDGE